Good morning, Judge Clinton, and may it please the court, Tom Cotter for Ryan Nelson. I would like to reserve five minutes for rebuttal, if I may. Our primary contention in this case is that the district court resolved factual issues, found that a jury could not find that the insured had a reasonable expectation of coverage, using factors that Arizona substantive law requires to be presented to a jury. The predicate of that is basically the predicate for a reasonable expectation doctrine. And if you go through our brief, you follow the Darner opinion and the subsequent opinions. In Arizona substantive law, it has long been recognized since the mid-'80s that insurance policies are contracts of adhesion, and that the industry anticipates and expects that they will not be read either by the insured or by the insurer's agent who sells the policy, and that the insured themselves seldom know what's in the policy, and that the insurer's agents seldom know what's in the policy. In this context, what happened was Icon Steel was owned by the Kirbys and their daughter, Cara Poole, was their office manager, and she arranged for a liability policy and a CGL policy of a million dollars and a $5 million umbrella policy. She, oddly enough, was previously a claims adjuster. Is that correct? Well, you know, and that's... Is the answer to that question yes? The answer to that question is yes, but... I don't mean to make it a big factor, but she, of all people, knows that policies don't cover the universe. Well, what happened was she only did liability collision claims on autos. She really had no training in insurance. And she, in fact, testified that she had no training, and her affidavit is part of the record saying why she expected the coverage and that, in fact, the insurance companies make much of the fact that she said she expected for those premium dollars, $147,000, that basically everything would be covered. Now, what happened in this... I have a little trouble with that concept. And I understand it's an overly broad statement. Let's face it. I mean, farmers now all state previously are busy advertising like crazy that there are exclusions to policies. That's true. And when I look at the Arizona Supreme Court's identification of factual situations, they talk, the first one, the contract terms cannot be understood by the reasonably intelligent consumer. Well, isn't that something the court can figure out? In fact, haven't Arizona courts figured out that some of these provisions, yeah, they can understand it if they elect to read it. You don't get a pass because you choose not to read it. If you do read it and you can understand it, then it gets enforced. Absolutely, Your Honor. But factor one under Gordner, which I think the court is referring to, says basically that even though the provision is not ambiguous to the court, that it's difficult to understand for a reasonably intelligent consumer who checks on their rights. So whether or not the court can find that is an interesting question that really isn't necessarily at issue in this case because in this case the full inadequate notice provisions are primarily involved where what happened was they bought the coverage. She got, before she bought the coverage, she got a proposal from the general agent that basically said we're going to provide this 2 million of general liability coverage and then listed the exclusions, and it specifically says exclusions, and it does not list any of the exclusions nor the policy language relied on by the insurer. And she then got a subsequent quote from her own agent which basically mirrored that. She signed it, bought the policy, her father paid for the policy, intending, as his affidavit says, to basically have full coverage, and she testified that they wanted full coverage, and that they did everything they could to protect the company, them individually, their employees. Well, what does full coverage mean? Well, full coverage means different things to different people, obviously, Your Honor. Well, let me ask you a simple one. Would it include injuries to their employees? Well, I anticipate that they would say that the workers' compensation coverage would provide, which was part of the proposal, coverage for their injury to their employees. Would it include intentional conduct? Well, obviously, one of the exclusions listed was intentional acts. Well, here's my concern. We're not the Supreme Court of Arizona. My fear is that if we adopt your position, we are saying taking the facts in the light most favorable to your claim, which we would have to do that the policy must say up front, you do not have a claim for intangible property rights injury. You don't have workers' comp. You don't have intentional conduct. You don't have coverage for injury to property in your possession. That would be a consequence of you prevailing in this case, and any insurer that writes CDL policies in Arizona would have to develop that format right up front, correct? Well, I understand your position, Your Honor, and I would say no, but I'm also going to flip it around. If neither was the district judge, the Arizona Supreme Court, and he managed to rule and he managed to opine that a reasonable insured would have read the policy, that no reasonable jury could find otherwise, which basically guts. And I'm not so sure, because if you look at the Arizona standard, it talks about whether the contract terms cannot be understood. The implication of that is what it says in the contract matters, that the insured doesn't get a pass just because he or she elects not to read the policy. Under the Arizona Supreme Court formulation, the terms do matter. They do matter, but it is not permissible to rule as a matter of law that there can be no reasonable expectation claim merely because you didn't read the policy. That's, in fact, gutting the premise of the reasonable expectation claim and is contrary to the holding in Darner. Well, I don't think that's quite what the district court said. The district court is saying, look, these plaintiffs may have said they had an expectation, but their own personal expectation really doesn't control because they didn't read the policy. So they can't speak to the question of whether the policy terms could be understood. And the Court goes on to conclude the policy terms could be understood if they had read the policy. May I first begin by reading just a small section of the judge's ruling, which is page 14 of the judge's ruling, where he says, Ms. Poole and any reasonable insurance purchaser would reasonably have known that the insurance proposal Ms. Poole reviewed while in the process of purchasing the CGL policy was not the policy itself. Ms. Poole did not review the CGL policy itself to review the terms of coverage and exclusions as a reasonable purchaser of insurance purchaser would have done. Look at page 12. Tangible versus intangible is not a distinction with the court finds cannot be understood by the reasonably intelligent consumer who might check on his or her rights. Sure. Well, that's the point being made by the Court. It can be understood, so it falls out under the Arizona Supreme Court formula. It doesn't, Your Honor. Any one of those four contentions under Gordnier will satisfy a reasonable expectation claim. The first contention under Gordnier, where the Court says even though it's unambiguous to the Court, it can't be understood by a reasonably intelligent consumer and it eviscerates dominant coverage, essentially. That, the Court says, that's one element, but the other. You're not claiming under that one? What are you claiming under? Lack of full and adequate notice and it eviscerates. Well, but that continues, and the provision is either unusual or unexpected or one that emasculates apparent coverage. Right. Well, what's so unusual about this limitation? This, this, what happens, this particular provision eliminates all liability coverage for claims under, of intangible property loss, and that eviscerates the $7 million or $6 million in coverage that they bought. I don't think that they were looking. I mean, I'm baffled as to how it is you think that's customarily included within comprehensive general liability coverage. What's the basis for that assertion? Well, I am not necessarily claiming that the provision is uncommon. I'm merely claiming that there was no full or adequate notice given to the provision. Well, but you can't have it just with the first part of the sentence. Read the sentence. I mean, I'm taking this version from your brief. Right. There's an and there. And the provision is either unusual or unexpected or one that emasculates apparent coverage. Right. Or, or, or, or. But the first part, all you're giving me is the first part. You're claiming because your client, or rather the insured, did not receive full and adequate notice, that's enough. But it's not enough. So what's the second part that you're saying? Or it eviscerates or emasculates, in that quote, which is a different case, the, the dominant coverage. Well, that comes right back to my question. I, I really don't think people are buying comprehensive or general liability insurance for the intangible property that you're talking about. I mean, if you're a book publisher or something. But so, so what tells us that that somehow emasculates the expected coverage? This is a, a weird episode, not one that people are likely to have in mind when they go out to buy coverage. Sure. But, but if you start with the, both the Darner proposition and the holding, securities holding case, where Darner holds that it's for the jury to determine whether she should have read this coverage. And it's, in the securities holding, it's for the jury to determine. You've already indicated my disagreement with that proposition. Okay. But, but I wonder, if you start with the proposition that reasonable expectations arises out of the fact that insurance companies do not expect their insureds to read their policies, and that there is, in fact, a Dicker deal. And the Dicker deal is basically $6 million in liability coverage for, you know, $147,000 in premiums, and subject to the terms that she's given notice of in the proposals. And then it's for the jury to determine, is it not? Whether or not it was reasonable for her not to read this 165-page policy. Well, either that she read it, or if she had read it, it would have been clear. Right. But getting back to what we started with about 10 minutes ago, if we rule in your honor, I think what would have to happen, if you ruled in our favor, is it would be remanded to the jury to determine whether she got full and adequate notice of that provision, and whether her expectations were reasonable. And the insurer would have to react to that.  Because she didn't have full and fair notice. That's correct. And the only way she could is if it were in bold writing on the binder. Right? Well, either that or on the forms. Or, for instance, some insurers could give DVDs as to what their policies mean, just like Farmers is saying, go ask your agent. Your honors, I see that I only have about a minute, 10 seconds left. We'll hear from the insurance company's counsel. Good morning. Thomas Crouch. May it please the Court, on behalf of Navigators. We're talking about probably one of the most fundamental aspects of commercial general liability coverage, and that is the notion that it applies to bodily injury or property damage, and property damage is defined to refer to physical injury or loss of use of tangible property. And that fundamental aspect of all, really, tens of thousands of CGL policies issued in Arizona and elsewhere has led countless courts in Arizona and elsewhere to rule that these policies do not cover a situation where the insured engages in tortuous conduct that inflicts harm upon economic interests or economic pecuniary interests, because those are decidedly intangible property. That was the situation here. The spoliation case is a claim that the insured is engaged in some sort of conduct and inflicted injury on a cause of action has prevented a plaintiff who is asserting that claim the inability to prove their case. In this case, it was against a chain manufacturer. Counsel, I was curious, in this case, I know there's an action by Mr. Nelson against the insurance company through the Dameron Agreement, and this might be a better question for your colleague over there, but what other actions does Mr. Nelson have that you know of? I mean, did he sue the chain manufacturer or he can't because of the loss of evidence? I just, in an accident like this, which is as serious as this accident is, and I think we can all agree it was a very serious accident, I can't imagine the only claim he has left is a spoliation claim against his former employer. Well, we could start at the beginning. This was a work-related injury, so he was covered by workers' compensation insurance and I believe has recovered significant sums, seven-figure sums, from a workers' compensation avenue. I believe he chose not to pursue his products claim when he learned that the chain had been, had disappeared. It was at that point that he did file a spoliation action against his employer, and that action was tendered to my client under the CGL policy and umbrella policy that sits over it. Was there ever an action filed against the employer for the injury? No. That would be the remedy for the injury itself. Would be the workers' comp? Would be a workers' comp claim, and there's an exclusive remedy. Got it. You can't sue in tort your employer for that injury. This set of facts does make this case hard because we have an undoubtedly injured plaintiff who recovers through workers' comp and otherwise can't pursue his employer, would seem to have at least the makings of a claim against the chain manufacturer, but can't pursue that claim because the employer, and we assume not intentionally, but in any event, the assembly, the chain and assembly were disposed of. So it's not surprising from some perspective that he turns to the employer and says, wait a minute, you're supposed to keep this, and I've been injured because you didn't keep this. And it's not that surprising the employer, or at least the management of the employer, not being the one that actually threw the chain away, would say, oops, well, okay, let our carrier know. Only then the carrier said, uh-uh. It wouldn't be surprising that such a claim would be made. In Arizona now, of course, and this is an issue I want to get to, in Arizona, of course, which was decided. I have a frog in my throat. May I grab some water? Certainly may. I understand exactly. I think San Francisco is unhealthy for those of us coming from the outside world where they have sun. I was going to say, it reminds me of that scene from E.T. with all the frogs escaping from the lab. Much better. But it isn't surprising they would bring a spoliation claim, at least early on in this litigation. But in the Lips case, which was a Supreme Court decision from Arizona that was rendered during the insurance or during the pendency of the underlying spoliation claim, the Arizona Supreme Court ruled that Arizona would not recognize a negligent spoliation claim. And it's interesting when you look at the rationale the court employed. The court observed that that claim is indeed one where a duty would be imposed to protect another party's economic or pecuniary interests. That was the very rationale the court employed for deciding not to recognize a spoliation, a negligent spoliation tort in Arizona. They didn't find it prudent to create, impose a duty to use care to protect somebody else's economic interests. In other words, the tort of spoliation was not a tort designed to protect somebody's body, bodily injury, or injury to their property, their tangible property. It would be a duty imposed to protect some sort of economic or pecuniary interest, which often carries with it difficulty in analyzing causation and damage and that sort of thing. So the Arizona Supreme Court has actually ruled, and did so during the pendency of the underlying claim, that that tort does not exist in Arizona. They withheld deciding whether an intentional spoliation tort would be recognized. And they did that because they concluded that the case before them didn't present what is necessary for such a tort, which is an intent to actually harm the cause of action. So in Arizona, that action doesn't actually exist. And that leads to – I'm happy to answer questions on the coverage issue. I'm sorry? Does that make this an empty exercise in that even if there's coverage, there's not a cause of action that can prevail? And that gets to my fraud or collusion argument. And I'm moving to that because that's – I think it's a very interesting issue in this case. Obviously, if the Court concludes and agrees that there's no coverage and concludes and agrees with my position that the district court was correct in concluding that there were – there was simply an absence of evidence on any of the four gaudenir factors for the reasonable expectations doctrine, you don't need to address my fraud or collusion argument. But I have passion about that argument. I've got to tell you, though, I pause because the parties are acting with complete self-interest. I mean, you understand why Mr. Nelson wants to proceed, and it's not hard to figure out why his employer wants to say, gee, we don't want to be holding the bag here. So I'm not sure how that's fraud. Your Honor, fraud or collusion is a defense in every case for a Damron agreement in Arizona. But that's not unique to Arizona. A lot of States recognize parties. Oh, I had these agreements, too. When I first heard about it, I scratched my head. But, oh, well, okay, I guess it makes some sense. Right. And courts that – courts addressing the fraud or collusion defense, they start with essentially what you just noted, which is, well, come on, an insured who has been sued and their carrier has concluded the claim is not within coverage and is not defending them, they should be free to do something to try to protect themselves. And if that includes stipulating to liability in exchange for a covenant not to execute, what should be so bad about that? Was there a defense with a reservation of rights in Arizona? In California, they do a reservation of rights and pick up the defense. You could have done that, right? The carrier could defend under a reservation of rights. I guess there's one difference between Arizona law and California law in that regard in that in Arizona, an insured can still proceed with one of these types of agreements, even where an insurer is defending under a reservation. But you would have control over the litigation, the $4.2 million judgment. Look, on your fraud and collusion, will you be able to guarantee for us that the Arizona Supreme Court will not find intentional spoliation to be a tort? No, Your Honor, I can't stand here. Well, with that, if they prevailed against the steel company for intentional spoliation, they would be on the hook. So why is it that fair and reasonable consideration for the agreement? Because if there was only an intentional spoliation case, and my client denied coverage for that, and the law is as it currently is, I wouldn't be arguing that there is any fraud or collusion here. But the claim in the court below, or I should say in the underlying action, was for both negligent spoliation and intentional spoliation. And the law in Arizona is that a Damron agreement and the resulting judgment must be free from fraud or collusion. And I might agree with you, Your Honor, here, that as to a stipulation of liability on intentional ---- What makes it fraudulent? What makes it collusive? If I understand the notion that there is no liability, but I don't understand how it is that the insured is supposed to appreciate that at a point in time when the insurer has declined coverage. And so the insured has no representation to make the kind of assessment that you're saying it should have made. Well, the insured did have representation in this particular case, and they had their motion filed to dismiss the case on grounds that Arizona doesn't recognize a tort of spoliation. Now, I want to make an important point here, because I believe my colleague would argue that at the time they entered the agreement, the Supreme Court decision hadn't come down yet. The Court of Appeals decision had, but the Supreme Court had not yet answered. And my colleague says, well, there's nothing fraudulent or collusive. The Supreme Court might have ruled a different way, and the insured would therefore be exposed. The point I want to make is that a judgment on a negligence spoliation claim was secured two months after the Supreme Court had ruled. The judgment did not get entered until two months. Well, was it a judgment on negligence spoliation or just a general judgment? General judgment. So there was an intentional spoliation claim. There was. And, of course, nobody disputes that that claim couldn't conceivably be covered. I frankly think that's a big dagger in your argument on fraud and collusion. Well, let me just try to persuade you otherwise by one last point then, and that is Arizona law makes it clear that the agreement and resulting judgment must be free from. And even if this Court believes that stipulating to a judgment and having judgment entered on intentional spoliation wouldn't be collusive, to the extent that judgment was on the entire complaint, including count one, the negligent and spoliation case, that part of it is not free from collusion because at the time that judgment was entered, Arizona's highest court has said that claim does not exist. And I would refer the Court to the Munzer v. Fioli case. I've cited it in my brief. And the point I want to make from that case is that that case involved a situation where the insurer was defending under a reservation of rights, and the carrier had said, we'll defend you and indemnify you against this part of the claim. We're reserving the right to deny coverage on this part of the claim. The parties proceeded and entered into a Morse agreement, which has the same characteristics as a Dameron agreement, it's just in a case where the carrier is defending. The Court said as to that part of the judgment or of the claim for which the carrier had acknowledged coverage, that part was invalid and unenforceable because the carrier had agreed to cover that part. The insured couldn't stipulate to liability on a claim for which the carrier had acknowledged coverage. The Court said the agreement was valid and enforceable as to the part of the case that the carrier had reserved rights upon, but of course the carrier was correct in that part not being covered. So that case is an example of where the agreement in its entirety. If you apply that here, you have negligent and intentional expoliation. What part of the $4.2 million should be carved out for negligence? It seems to me intentional conduct makes it all so much worse that it trumps any recovery for negligence expoliation. My time is up, but I'd love to answer your question. I don't believe that you have to decide what part is intentional and what part is negligence. As to that part that's intentional, everyone agrees that can't possibly be covered  As to that part of the judgment that is for a judgment on negligence expoliation claim, I urge the Court to rule that that part is not free from collusion because it is a claim that doesn't exist under Arizona law, and it didn't exist according to the highest court of Arizona at the time the judgment was entered. Your Honor, thank you for the additional minute. I ask for affirmance, both because the expoliation claim was not covered and the Court correctly so ruled, and because the judgment to the extent it is on negligent expoliation is fraudulent or collusive. Thank you. Thank you. We'll have rebuttal. Very quickly, Your Honor, Munzer v. Fiola does not stand for the proposition cited before. Every policy has a cooperation clause. The insurer had said it would cover a part of the claim, so it had not breached the policy as to that part of the claim. So the insured couldn't, consistent with the cooperation clause, enter into the deal. It had nothing to do with fraud or collusion. Fraud or collusion have been litigated in Arizona in the Gilbreth and the Painter case. Painter, the insurer, said the judgment is no good because you didn't vigorously defend on statute of limitations. The Court said no. You know, you can't leave your insured hanging out to dry and expect him to litigate on defenses. In Gilbreth, here, there wasn't even a cause of action. The claim, a mom's claim for negligent infliction of mental distress because of the abuse to her son, you have to be in the zone of danger in Arizona. The Supreme Court said no. That's a valid claim because it's a valid judgment. If you had wanted to prevent the claim, you should have come in and defended under a reservation of rights, and then you could have participated and litigated that claim. In this instance, though, Your Honor, I don't want to give the impression that there was anything fraudulent or collusive. The defendant was identified very briefly at the beginning of the case by an attorney at a major law firm who agreed to the Damron deal, who filed an affidavit saying he was simply protecting his client's interests because he was afraid that the motion to dismiss would be denied. And if you look at the Lips 2 case, which was decided after we entered into the agreement and after the default had been entered, but before the default judgment hearing on damages, so that at the time the judgment was entered and the default was entered, the Supreme Court hadn't spoken. But even Lips 2, which is the Supreme Court opinion which says there's no general negligent spoliation claim, specifically makes a comment which I think is relevant. They say, A mere request for assistance does not create a legal duty to help another. Accord restatement, the fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him the duty to such action. We therefore decline Lips' invitation to establish a negligent spoliation claim. In that case, the allegations were merely that a doctor had asked a hospital to retain a part, and they had neglected to do so, never having agreed to do so. In our case, the facts are specifically that after Ryan Nelson's leg was crushed, the fire department from Apache Junction went to the employer and said you need to keep the chain. Then Ryan's father did, and at that point the Kirby, Mr. Kirby Hohn, the thing, said I will keep the chain and keep it available for testing. Then the State Compensation Fund investigator, because they have a subrogation claim back, said you have to keep this chain so we can test it. And he said he would. And then a few weeks later when the State Compensation Fund guy went to get the chain, it couldn't be found. And so under Arizona Rec ---- Now giving you the extra minute we gave Mr. Crouch and a minute beyond. I just want to say Arizona recognizes the restatement 323, 324 of torts. You can voluntarily assume a duty. So under the facts alleged here, in fact, the Arizona Supreme Court might find spoliation. There was nothing fraudulent about this deal. Thank you. Thank both counsel for your argument. The case just argued is submitted.
judges: Clifton, Owens, Moskowitz